229 P.3d 669 (2010)
168 Wash.2d 350
STATE of Washington, Respondent,
v.
Daniel Marshall AGUIRRE, Petitioner.
No. 82226-3.
Supreme Court of Washington, En Banc.
Argued October 29, 2009.
Decided March 4, 2010.
*671 Sheryl Gordon McCloud, Law Offices of Sheryl Gordon McCloud, Seattle, WA, for Petitioner.
Carol L. La Verne, Thurston County Prosecutor's Office, George Oscar Darkenwald, Olympia, WA, for Respondent.
J.M. JOHNSON, J.
¶ 1 Daniel Marshall Aguirre appeals his convictions and sentence for assault and rape. Aguirre alleges that the trial court erred by admitting the testimony of the prosecution's expert, excluding defense testimony and limiting cross-examination, instructing the jury on the definition of "unlawful force," and refusing to continue sentencing following his retention of new counsel. Aguirre also alleges that the trial court's addition of a deadly weapon enhancement to his sentence for assault with a deadly weapon violates double jeopardy. Under the analysis articulated below, we affirm the Court of Appeals and reject all of Aguirre's claims.

FACTS AND PROCEDURAL HISTORY
¶ 2 Both the victim and Aguirre are members of the United States Army. II Verbatim Report of Proceedings (VRP) (Feb. 13, 2007) at 325; IV VRP (Feb. 15, 2007) at 699. The two met as a consequence of their military service when the victim enrolled in a noncommissioned officer training program for which Aguirre served as an instructor. II VRP (Feb. 13, 2007) at 328; IV VRP (Feb. 15, 2007) at 705. They began a romantic relationship on the same day that the victim graduated from the training program in early June. II VRP (Feb. 13, 2007) at 330-31; IV VRP (Feb. 15, 2007) at 709, 711.
¶ 3 Their relationship deteriorated over the course of the summer. On Friday, August 26, 2006, Aguirre phoned the victim and requested that she meet him at his house; the victim agreed to do so. II VRP (Feb. 13, 2007) at 339. She arrived at the house before Aguirre and waited for him inside. Id. The victim testified that Aguirre appeared to be in a bad mood when he entered the house *672 a few minutes later in the company of another soldier. Id. at 340, 342. Aguirre's bad mood eventually escalated to anger and violence directed at the victim. Id. at 343-46. At one point, Aguirre sat on the victim's legs and ran the blade of a combat knife up and down her face and throat while warning her to "never break the circle of trust [or] leave him" and asking her, "`How does it feel to date a psychopath?'" Id. at 346-47. The victim testified that Aguirre "explained to me that he had stopped taking his pills and that I was his pill and that as long as he had me, that was fine." Id. at 347.
¶ 4 The victim escaped outside but ultimately returned to the house when she failed to locate her car keys in order to drive home. Id. at 349-50. Later that night, Aguirre forcibly raped her. Id. at 351-52. The victim slept on the couch and left the next morning after finding her car keys. Id. at 353. Despite the violence that she had suffered at his hands, the victim returned to Aguirre's house later in the day to see him. Id. at 355. They quarreled and the victim called the police; however, she did not report the assault or the rape to the officer who responded to the call. Id. at 357-58.
¶ 5 The victim sustained bruises to her nose, ribs, arms, inner thighs, and right calf during the altercation with Aguirre. Id. at 448, 474. When she arrived at work on Monday, August 28, 2006, her co-workers noticed the bruises and encouraged her to contact the authorities. Id. at 359-60. The victim drove to the Lacey Police Department and was interviewed by Jeffrey Wilkinson, a Thurston County Deputy Sheriff, that same day. Id. at 360, 469-76. The ensuing prosecution resulted in Aguirre's convictions of second degree assault and second degree rape. V VRP (Feb. 16, 2007) at 965.
¶ 6 During trial, the events relevant to the five issues that Aguirre raises in the present appeal are as follows:
¶ 7 First, the trial court admitted the testimony of Cheryl Stines, a sergeant with extensive experience investigating physical and sexual abuse cases. III VRP (Feb. 14, 2007) at 495. Sergeant Stines had interviewed the victim following the assault and rape. Id. at 509-10. Stines testified as to the general demeanor of victims of sexual assault and domestic violence and described the victim's demeanor during the interview, but she did not give her opinion on whether the victim's demeanor indicated that the victim was a sexual assault victim. Id. at 506-09.
¶ 8 Second, the trial court excluded the proffered testimony of James Aguirre,[1] the defendant's brother, regarding the victim's efforts to get in touch with the defendant following the rape and assault. Id. at 587-92. The defense sought to admit J. Aguirre's testimony to establish that the victim had lied about contacting J. Aguirre in order to reach the defendant, thereby undermining her credibility. Id. at 588-89. The trial court ruled that this testimony amounted to impeachment on a collateral matter and, therefore, was inadmissible. Id. at 592-93. Citing the rape shield statute,[2] the court also limited Aguirre's ability to cross-examine the victim about seeing another man during her relationship with Aguirre. IV VRP (Feb. 15, 2007) at 746, 754.
¶ 9 A third event pertinent to this appeal followed the close of evidence. Shortly after deliberations commenced, the jury requested clarification from the court regarding the definition of "unlawful force." V VRP (Feb. 16, 2007) at 952; Clerk's Papers (CP) at 61. The trial court answered that "[u]nlawful force ... refers to any force alleged to have occurred that was not consented to and that otherwise meets the definition of assault as contained in Instruction # 12." CP at 61.[3] Defense counsel did not object toand, in fact, approved ofthis definition. V VRP *673 (Feb. 16, 2007) at 953. The jury went on to find Aguirre guilty of second degree assault and second degree rape. Id. at 965. By special verdict, the jury also found that Aguirre had been armed with a deadly weapon during the assault. Id. at 966.
¶ 10 Another relevant event occurred almost two months later when the court reconvened for sentencing. III VRP (Apr. 10, 2007) at 3. Less than one week earlier, Aguirre had submitted a motion to substitute counsel. Id. at 4. His new counsel, in turn, requested to continue sentencing for eight weeks in order to give herself adequate time to prepare. Id. The trial court denied the requested continuance, noting that the victim had flown across the country from her new home in Pennsylvania for the proceedings and had a right to promptly proceed with sentencing.[4]Id. at 17, 19-20. However, the court granted a brief continuance to enable the defendant's military chain of command to attend the sentencing. Id. at 20-21. Aguirre's new counsel thought that the shorter continuance did not give her sufficient time to prepare for sentencing, and Aguirre accordingly withdrew his motion to substitute counsel. Id. at 18. His trial attorney continued as the counsel of record at sentencing. Id. at 22.
¶ 11 The final event of note took place two days later, when Aguirre was sentenced to 14 months for the assault and 125 months for the rape. VRP (Apr. 12, 2007) at 24. The trial court added 12 month deadly weapon enhancements to both charges, for a total sentence of 163 months.[5]Id. at 24-25. Aguirre appealed. CP at 142-57. The Court of Appeals rejected all of Aguirre's claims and affirmed the trial court's judgment and sentence in an unpublished opinion. State v. Aguirre, noted at 146 Wash.App. 1048, 2008 WL 4062820.
¶ 12 Aguirre subsequently petitioned this court for review, alleging that the trial court erred by (i) admitting the testimony of Sergeant Stines, which Aguirre alleges amounted to improper vouching for the victim's credibility; (ii) excluding the proffered impeachment testimony of J. Aguirre and limiting Aguirre's ability to cross-examine the victim, (iii) incorrectly defining "unlawful force" for the jury, and (iv) denying the requested eight-week continuance in violation of his right to counsel. The petition further argued that the addition of a weapon enhancement to his sentence for the second degree assault violated double jeopardy. We treat these claims separately and resolve them as follows:

ANALYSIS

1. Expert Testimony

¶ 13 Aguirre first argues that Sergeant Stines' testimony describing the victim constituted impermissible vouching for the victim's credibility and that the trial court's decision to admit it was error. We review trial court judgments regarding the admissibility of expert testimony for abuse of discretion. State v. Kirkman, 159 Wash.2d 918, 927, 155 P.3d 125 (2007). That is, such judgments merit reversal only if the trial court acts on unreasonable or untenable grounds. In re Det. of Anderson, 166 Wash.2d 543, 549, 211 P.3d 994 (2009) (citing Indus. Indem. Co. of Nw., Inc. v. Kallevig, 114 Wash.2d 907, 926, 792 P.2d 520 (1990)).
*674 ¶ 14 In considering testimony that addresses witness demeanor, "the court will consider the circumstances of the case, including the following factors: `(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.'" Kirkman, 159 Wash.2d at 928, 155 P.3d 125 (internal quotation marks omitted) (quoting State v. Demery, 144 Wash.2d 753, 759, 30 P.3d 1278 (2001)). If expert testimony satisfies these requirements, the court may, in its discretion, admit the testimony into evidence.
¶ 15 Stines' testimony satisfied the requirements of the Kirkman test. Stines did not reiterate the victim's testimony or explain how that testimony was consistent with the victim having suffered domestic violence. Pet. for Review at 6. On the contrary, Stines gave a general description of the demeanor of domestic violence victims, stating several times that every victim responds to abuse differently. III VRP (Feb. 14, 2007) at 502, 504-05 ("[E]ach individual is different."), 506 ("[A]gain, everybody is different."), 507-08. See State v. Stevens, 58 Wash.App. 478, 496, 794 P.2d 38 (1990) (expert testimony generally describing symptoms exhibited by rape victims admissible when relevant and not offered as direct assessment of credibility of victim).
¶ 16 Likewise, when Stines described the victim's demeanor, she refrained from stating or implying that the victim had been a victim of domestic violence. III VRP (Feb. 14, 2007) at 509-18. Rather, Stines limited her testimony to her objective observations of the victim during their interview as compared to other victims whom Stines had interviewed during her lengthy criminal justice career. Id. at 512-13, 515, 518. Such testimony was likely helpful to the jury in evaluating for themselves whether the victim had in fact been assaulted and raped. It was not a direct comment on Aguirre's guilt or the victim's veracity. It was based on Stines' own inferences from the evidence. Thus, Stines' testimony satisfied the Kirkman test and did not amount to improper vouching for the victim's credibility. We cannot say that the trial court abused its discretion in coming to an identical conclusion and admitting the testimony.
¶ 17 Aguirre's reliance on State v. Black, 109 Wash.2d 336, 745 P.2d 12 (1987), State v. Garrison, 71 Wash.2d 312, 427 P.2d 1012 (1967), and State v. Haga, 8 Wash.App. 481, 507 P.2d 159 (1973), when arguing for the opposite conclusion, is misplaced. These cases are distinguishable. In each, the witness either gave or was asked to give his opinion on the credibility of another party. A direct opinion on the credibility of the victim was given in Black, a direct opinion on the guilt of the defendant was solicited but excluded in Garrison, and an indirect opinion on the guilt of the defendant was given in Haga.[6] Here, Stines' testimony addressed neither the guilt of Aguirre, as did the testimony at issue in Garrison and Haga, nor the veracity of the victim, as did the expert testimony at issue in Black. Accordingly, we affirm the Court of Appeals decision dismissing Aguirre's claim that Stines' testimony amounted to improper vouching for the victim's credibility.

2. Exclusion of Proffered Defense Testimony of the Defendant's Brother and Limitation of Cross-Examination

¶ 18 Aguirre next argues that the trial court erred by excluding the testimony of his brother, J. Aguirre, as impeachment on a collateral matter, and by limiting his ability to cross-examine the victim regarding her alleged relationship with another man.[7] *675 Questions of relevancy and the admissibility of testimonial evidence are within the discretion of the trial court, and we review them only for manifest abuse of discretion. In re Welfare of Shope, 23 Wash.App. 567, 569, 596 P.2d 1361 (1979). An erroneous ruling with respect to such questions requires reversal only if there is a reasonable possibility that the testimony would have changed the outcome of trial. State v. Fankhouser, 133 Wash.App. 689, 695, 138 P.3d 140 (2006). Regarding the second assertion, we review a trial court's decision to limit cross-examination of a witness for impeachment purposes for abuse of discretion. Roper v. Mabry, 15 Wash.App. 819, 822-23, 551 P.2d 1381 (1976); State v. Temple, 5 Wash.App. 1, 4-5, 485 P.2d 93 (1971).
¶ 19 The trial court did not manifestly abuse its discretion when it excluded J. Aguirre's testimony. It is well settled that neither party may impeach a witness on a collateral issue; that is, on facts not directly relevant to the trial issue. Fankhouser, 133 Wash.App. at 693, 138 P.3d 140 (citing State v. Descoteaux, 94 Wash.2d 31, 37, 614 P.2d 179 (1980), overruled on other grounds by State v. Danforth, 97 Wash.2d 255, 257 n. 1, 643 P.2d 882 (1982)). Facts are relevant if they have a tendency to make the existence of any consequential fact more or less probable. ER 401.
¶ 20 J. Aguirre would have testified that, after the assault and rape, the victim tried to contact him on a social networking website in an effort to get in touch with the defendant. III VRP (Feb. 14, 2007) at 588. Defense counsel argued that this testimony was relevant because it would impeach the victim's testimony that she had not contacted J. Aguirre through the website, thereby undermining her credibility. Id. at 588-89. However, the victim herself had already testified that she contacted the defendant during that time frame, and the question relevant to the trial issue of the defendant's guilt was whether the victim contacted the defendant after the rape and assault, not whether the victim contacted J. Aguirre online. Accordingly, the proffered testimony was not directly relevant to a trial issue and the trial court did not err by excluding it as impeachment on a collateral issue.
¶ 21 The trial court also did not err by limiting Aguirre's cross-examination of the victim regarding the details of her alleged relationship with another man. The rape shield statute clearly limits the ability of either party to introduce at trial evidence of the past sexual behavior of the complaining witness. RCW 9A.44.020(2).[8] Although Aguirre does have a constitutional right to present a defense, the scope of that right does not extend to the introduction of otherwise inadmissible evidence. State v. Otis, 151 Wash.App. 572, 578, 213 P.3d 613 (2009) (citing State v. Thomas, 123 Wash.App. 771, 778, 98 P.3d 1258 (2004)). The admissibility of evidence under the rape shield statute, in turn, "is within the sound discretion of the trial court." State v. Hudlow, 99 Wash.2d 1, 17, 659 P.2d 514 (1983).
¶ 22 Again, it was well within the trial court's sound discretion to conclude that the testimony that the defense sought to elicit during cross-examination was inadmissible under RCW 9A.44.020(2) as evidence of the victim's past sexual behavior. Aguirre's constitutional right to present a defense was satisfied by the trial court's decision to permit him to testify as to his belief that the victim had been seeing another man during their relationship. IV VRP (Feb. 15, 2007) at 746, 754. Thus, the trial court did not err when it limited Aguirre's ability to cross-examine the victim about her alleged relationship with another man. We affirm the Court of Appeals opinion rejecting Aguirre's claim on both evidentiary issues.

*676 3. Jury Instruction

¶ 23 The defendant also alleges that the trial court erred by incorrectly defining "unlawful force" for the jury (a definition approved by defense counsel at trial). Specifically, Aguirre now argues that the definition misstated the law because it focused on the victim's lack of consent to the contact rather than on the reasonableness of the defendant's subjective intent.
¶ 24 "`Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" Keller v. City of Spokane, 146 Wash.2d 237, 249, 44 P.3d 845 (2002) (emphasis added) (quoting Bodin v. City of Stanwood, 130 Wash.2d 726, 732, 927 P.2d 240 (1996)); see also State v. Riley, 137 Wash.2d 904, 909, 976 P.2d 624 (1999). Even if an instruction may be misleading, it will not be reversed unless prejudice is shown by the complaining party. Keller, 146 Wash.2d at 249, 44 P.3d 845. If, on the other hand, a jury instruction correctly states the law, the trial court's decision to give the instruction will not be disturbed absent an abuse of discretion. Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP, 110 Wash.App. 412, 430, 40 P.3d 1206 (2002). Supplemental instructions to the jury such as the one given in this case generally should not go beyond matters that have been, or could have been, argued to the jury. State v. Ransom, 56 Wash.App. 712, 714, 785 P.2d 469 (1990).
¶ 25 At the request of the jury, and with the approval of defense counsel, the trial court defined unlawful force as "any force alleged to have occurred that was not consented to and that otherwise meets the definition of assault as contained in Instruction # 12." CP at 61. Instruction 12, in turn, provided that the reasonableness of the defendant's subjective intent regarding the offensiveness of the force was relevant to the determination of whether an assault had occurred. CP at 86. Since jury instructions are read as a whole, the definition incorporated this latter reference to the reasonableness of Aguirre's subjective intent. Keller, 146 Wash.2d at 249, 44 P.3d 845. It correctly stated the law. It did not go beyond matters that Aguirre was allowed to argue before the jury, given that at trial he had the opportunity to present a full defense against the assault charge. It thus follows that the definition was not erroneous. Accordingly, the trial court did not err in defining "unlawful force" for the jury and we sustain the opinion of the Court of Appeals with respect to this issue.

4. Continuance of Sentencing for New Counsel

¶ 26 Aguirre next argues that the trial court violated his right to counsel by denying his request for an eight week continuance, thereby preventing him from being represented by his new preferred counsel at sentencing.
¶ 27 The Sixth Amendment guarantees the right to select and be represented by one's preferred attorney. Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Additionally, a criminal defendant who pays for his own attorney generally has a right to counsel of his choice. State v. Roth, 75 Wash.App. 808, 824, 881 P.2d 268 (1994). That said, "`the right to retain counsel of one's own choice has limits.'" Id. (quoting State v. Chase, 59 Wash.App. 501, 506, 799 P.2d 272 (1990)); see also State v. Stenson, 132 Wash.2d 668, 733, 940 P.2d 1239 (1997) ("A defendant does not have an absolute, Sixth Amendment right to choose any particular advocate."). The right to choose one's counsel does not, for example, permit a defendant to unduly delay the proceedings. Roth, 75 Wash.App. at 824, 881 P.2d 268. Nor may a defendant insist on representation by an attorney he cannot afford or who declines to represent him. State v. Roberts, 142 Wash.2d 471, 516, 14 P.3d 713 (2000).
¶ 28 Although the right to counsel is limited, a defendant may, under some circumstances, be unlawfully deprived of it by denial of a motion for continuance. Chase, 59 Wash.App. at 506, 799 P.2d 272. In considering such motions, the trial court must weigh the defendant's right to choose his counsel against the public's interest in the *677 prompt and efficient administration of justice. Roth, 75 Wash.App. at 824-25, 881 P.2d 268. The resolution of this balancing exercise falls squarely within the discretion of the trial court. State v. DeWeese, 117 Wash.2d 369, 376, 816 P.2d 1 (1991).
¶ 29 Aguirre argues that an eight week continuance would not have unduly delayed sentencing, noting that it was his first request for a continuance and that his new counsel needed more time to prepare. However, Aguirre and his trial counsel had already spent almost two months preparing for sentencing; the resulting work product presumably would have been available to his new counsel. Even more importantly, the victim had a constitutional right to be present at Aguirre's sentencing. See WASH. CONST. art. I, § 35 (codifying, pursuant to the victims' rights amendment, the right of felony victims to attend sentencing). She had flown across the country to exercise that right and likely would not have been able to repeat the trip in the future. VRP (Apr. 10, 2007) at 19-20. Given these facts, the trial court acted well within its discretion when it resolved the balance between the victim's rights, Aguirre's right to new counsel, and the public's interest in the timely administration of justice in favor of denying the requested continuance. Accordingly, we affirm the Court of Appeals opinion rejecting Aguirre's claim that the trial court violated his right to counsel by denying his request for a lengthy continuance on the eve of sentencing.

5. Double Jeopardy

¶ 30 The fifth and final claim that Aguirre raises on appeal is that the addition of a deadly weapon enhancement to his sentence for second degree assault violated double jeopardy. The double jeopardy clauses of the federal and state constitutions function identically to prevent defendants from being twice put in jeopardy for the same crime. See State v. Daniels, 160 Wash.2d 256, 261, 156 P.3d 905 (2007); State v. Gocken, 127 Wash.2d 95, 107, 896 P.2d 1267 (1995); State v. Schoel, 54 Wash.2d 388, 391, 341 P.2d 481 (1959) (both clauses are "identical in thought, substance, and purpose"). Double jeopardy claims raise questions of law and are accordingly reviewed de novo on appeal. Daniels, 160 Wash.2d at 261, 156 P.3d 905 (citing State v. Jackman, 156 Wash.2d 736, 746, 132 P.3d 136 (2006)).
¶ 31 Washington courts repeatedly have held that double jeopardy is not offended by weapon enhancements even when being armed with the weapon is an element of the underlying crime. See, e.g., State v. Claborn, 95 Wash.2d 629, 636-37, 628 P.2d 467 (1981); State v. Huested, 118 Wash.App. 92, 95-96, 74 P.3d 672 (2003) ("`a person who commits certain crimes while armed with a deadly weapon will receive an enhanced sentence, notwithstanding the fact that being armed with a deadly weapon was an element of that offense.'" (quoting State v. Caldwell, 47 Wash.App. 317, 320, 734 P.2d 542 (1987))). Aguirre alleges that these cases must be reconsidered following Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). However, we recently rejected this argument in State v. Kelley, 168 Wash.2d 72, 226 P.3d 773 (2010). Consistent with that holding, adding a deadly weapon enhancement to Aguirre's sentence for second degree assault, an element of which is being armed with a deadly weapon, did not offend double jeopardy. Consequently, we affirm the Court of Appeals decision rejecting Aguirre's double jeopardy claim.

CONCLUSION
¶ 32 The trial court did not err in its evidentiary rulings, its jury instructions, or its denial of Aguirre's request for an eight week continuance of sentencing. Furthermore, double jeopardy was not violated by the addition of a deadly weapon enhancement to Aguirre's sentence for second degree assault; notwithstanding that being armed with a deadly weapon is an element of that crime. Accordingly, we reject all of Aguirre's claims and sustain the Court of Appeals opinion affirming Aguirre's convictions and sentence.
WE CONCUR: MADSEN, C.J., OWENS, C. JOHNSON, FAIRHURST, ALEXANDER, SANDERS, STEPHENS, CHAMBERS, JJ.
NOTES
[1] For the sake of clarity, James Aguirre will be referred to as "J. Aguirre" throughout the opinion.
[2] RCW 9A.44.020.
[3] Jury instruction 12 read, in part: "An assault is an intentional touching or striking of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking is offensive if the touching or striking would offend an ordinary person who is not unduly sensitive.... An act is not an assault, if it is done with the consent of the person alleged to be assaulted." CP at 86 (emphasis added).
[4] See WASH. CONST. art. I, § 35.
[5] These weapon enhancements were imposed in accordance with the Sentencing Reform Act of 1981. See RCW 9.94A.533(4) ("The following additional times shall be added to the standard sentence range for felony crimes committed after July 23, 1995, if the offender or an accomplice was armed with a deadly weapon ... (a) Two years for any felony defined under any law as a class A felony or with a statutory maximum sentence of at least twenty years ...; (b) One year for any felony defined under any law as a class B felony or with a statutory maximum sentence of ten years...."). Second degree assault is a class B felony. RCW 9A.36.021(2)(a). Any knife having a blade longer than three inches is a deadly weapon. RCW 9.94A.825. Second degree rape is a class A felony with a statutory maximum sentence of life imprisonment. RCW 9A.44.050(2); RCW 9A.20.021(1)(a). It is unclear why the court imposed a 12 month deadly weapon enhancement, rather than a 2 year enhancement, for Aguirre's sentence for the rape, or why the court added any deadly weapon enhancement to that crime, given that there is no evidence in the record that Aguirre was armed during the rape. However, neither of the parties address this issue on appeal, and we therefore do the same.
[6] In Black, the expert whose testimony was challenged had testified that "`[t]here is a specific profile for rape victims and [the victim] fits it.'" Black, 109 Wash.2d at 339, 745 P.2d 12 (emphasis omitted). In Garrison, a bartender was asked to give his opinion as to whether the defendant was one of the parties who participated in a burglary at the tavern where the bartender worked. Garrison, 71 Wash.2d at 315, 427 P.2d 1012. Finally, in Haga, an ambulance driver who responded to the scene of a double murder testified that the defendant, the husband and father, respectively, of the victims, was unusually "`calm and cool about it,'" behavior very unlike that of the innocent relatives of murder victims whom the driver had observed. Haga, 8 Wash. App. at 490, 507 P.2d 159.
[7] Aguirre contended that he had ended his relationship with the victim because of the alleged relationship. IV VRP (Feb. 15, 2007) at 736-37, 739-40, 742-43. Aguirre argued that this biased the victim against him and motivated her to lie about the assault and rape. Pet. for Review at 10-12.
[8] The statute reads, in relevant part: "Evidence of the victim's past sexual behavior including but not limited to the victim's marital history, divorce history, or general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards is inadmissible on the issue of credibility and is inadmissible to prove the victim's consent except as provided in subsection (3) of this section...." RCW 9A.44.020(2).